**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE FEB 1 4 2019

_for_ CHIEF JUSTICE

This opinion was filed for record

at 8 a.m. on Feb 14, 2019

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 95635-9 |
| v. | ) | |
| | ) | En Banc |
| MICHAEL L. GEHRKE, | ) | |
| | ) | |
| Petitioner. | ) | Filed FEB 1 4 2019 |
| | ) | |

WIGGINS, J.—Michael Gehrke was charged with second degree murder, predicated on second degree assault, for the death of Christopher Pineyro. Immediately before the State rested its case, the trial court allowed the State to amend its charges to include first degree manslaughter. The jury found Gehrke guilty of first degree manslaughter but not second degree murder.

Gehrke asks us to order the trial court to vacate his conviction for first degree manslaughter and dismiss with prejudice, arguing that allowing the amendment violated his constitutional right to be informed of the charges against him. We hold that allowing the State to amend its charge after completing its case in chief and immediately prior to resting violated Gehrke's constitutional right. We agree with Gehrke and reverse the decision of the Court of Appeals and remand to the trial court for vacation of his conviction, dismissal of the first degree manslaughter charge with prejudice, and further proceedings consistent with this opinion.

FACTS AND PROCEDURAL HISTORY

Michael Gehrke was convicted of first degree manslaughter for the death of Christopher Pineyro, who died after being stabbed in a street fight with Gehrke. The two men had a history of conflict. At trial, the opposing sides offered conflicting accounts of the fight. According to Gehrke, he had just arrived at a friend's house in a vehicle driven by his girlfriend when Pineyro rode up to him on a bicycle. Pineyro stated that he had "something" for Gehrke and stopped his bicycle. Pineyro then reached behind himself and began to "shed his things." Gehrke reacted and kicked Pineyro's bike frame, which hit Pineyro in the leg. Pineyro and the bike fell to the ground together.

When Pineyro stood up, he was wielding a hammer. Gehrke drew a pocketknife. Pineyro began swinging the hammer at Gehrke, and Gehrke backed away. Pineyro advanced, and Gehrke retreated approximately 17 feet, toward a fence. Gehrke testified that he saw no opportunity to get any farther back and that "I thought that if I didn't do something, he would—he would back me up against the fence and hit me with the hammer." Gehrke jabbed at Pineyro twice with the knife, fatally wounding Pineyro in the neck. The police arrived and Gehrke admitted to striking Pineyro, saying, "I'm the guy. I stabbed him and it was self-defense."

The State charged Gehrke with second degree felony murder predicated on second degree assault. Clerk's Papers (CP) at 1. On the first day of trial, the prosecutor stated that the State was *considering* amending the charges to include first degree manslaughter as an alternative charge but noted that he was not currently seeking such an amendment. The prosecutor told the trial court, "I don't think that it

2

would be prejudicial [to amend the charge], and it's a lesser offense.[1] [The defense was] not in favor of that [amendment], therefore, I'm not going to submit that, but I did put them on notice that, at the conclusion of the State's case, I *may* be moving for that to be charged in the alternative."

After the State called its last witness but before it had formally rested, the prosecutor moved to amend the information to add a manslaughter charge. The State made clear that it intended to rest even if the amendment was not allowed ("The State does intend on resting [regardless] of the Court's decision [to allow the amendment] in this case."). Defense counsel objected to the prosecutor's motion to amend, on the grounds that manslaughter is not a lesser included offense of felony murder and that Gehrke did not mount a defense to manslaughter, which requires an element of recklessness not required for felony murder.

The trial court granted the State's motion to amend the information. The court explained that Gehrke's possible defense strategy against a first degree manslaughter charge was "essentially the same" as the defense he had presented to the second degree murder charge. It is unclear from the record whether the trial court believed that the manslaughter charge was a lesser included offense of the original felony murder charge.

The jury was apparently unable to agree as to whether Gehrke was guilty of second degree murder.[2] It found Gehrke guilty of first degree manslaughter.

---

[1] As discussed below, this characterization of first degree manslaughter as a "lesser offense" was inaccurate and misleading.

[2] When filling out the verdict forms, the jury left blank "Verdict Form A," for second degree murder, but on "Verdict Form B" found Gehrke guilty of first degree manslaughter. CP at 188-89. The jury

3

Gehrke appealed. The Court of Appeals affirmed the trial court, holding that, under CrR 2.1(d), Gehrke could not demonstrate prejudice because his defense at trial was self-defense and that would have also been his defense to the amended charge. Gehrke petitioned this court for review, which we granted.

## STANDARD OF REVIEW

We review a trial court's ruling on a proposed amendment to an information for abuse of discretion. *State v. Lamb,* 175 Wn.2d 121, 130, 285 P.3d 27 (2012) (citing *State v. Schaffer,* 120 Wn.2d 616, 621-22, 845 P.2d 281 (1993)).

## ANALYSIS

The trial court violated Gehrke's constitutional rights by allowing the State to add an alternative charge against Gehrke after it finished its case in chief and immediately before it rested.

I.  Criminal defendants are entitled to receive notice of the nature of the charges and an opportunity to present a defense

It is a central right, provided in our constitution, that "[i]n criminal prosecutions the accused shall have the right . . . to demand the nature and cause of the accusation against him." WASH. CONST. art. I, § 22. Pursuant to this right, "[t]he accused, in criminal prosecutions, has a constitutional right to be apprised of the nature and cause of the accusation against him. . . . This doctrine is elementary and of universal application, and is founded on the plainest principle of justice." *State v. Ackles,* 8 Wash. 462, 464-65, 36 P. 597 (1894). The "accused must be informed of the charge

---

had been instructed to leave Verdict Form A blank if it could not agree on a verdict on that charge. 4 Report of Proceedings at 773 (oral instruction); CP at 173 (written instruction). This indicates that the jury was unable to agree on the charge of second degree murder.

4

he is to meet at trial and cannot be tried for an offense not charged." *State v. Carr*, 97 Wn.2d 436, 439, 645 P.2d 1098 (1982). Thus, "defendants have a right to be fully informed of the nature of accusations against them so that they may prepare an adequate defense. This right is satisfied when defendants are apprised with reasonable certainty of the accusations against them." *State v. Leach*, 113 Wn.2d 679, 695, 782 P.2d 552 (1989) (citations omitted).[3]

### A. *Criminal rules that allow for midtrial amendments operate within the confines of the constitution and cannot be read to contravene the constitution*

The constitutional rights created by article I, section 22 inherently limit when and whether the State may make midtrial amendments to its information. *State v. Olds*, 39 Wn.2d 258, 261, 235 P.2d 165 (1951) (holding that "a new count charging a different crime . . . would contravene Art. I, § 22, of the state constitution"). Thus, although CrR 2.1(d)—used here by the State to amend its information midtrial— provides that "[t]he court may permit any information or bill of particulars to be amended at any time before verdict or finding if substantial rights of the defendant are not prejudiced," this rule is inherently limited by article I, section 22. *State v. Pelkey*, 109 Wn.2d 484, 490, 745 P.2d 854 (1987) (referring to what was then CrR 2.1(e) but is now 2.1(d)).

---

[3] A due process right also exists in this realm. The United States Supreme Court has articulated that "the most basic ingredients of due process of law" include "'[a] person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense.'" *Washington v. Texas*, 388 U.S. 14, 18, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (quoting *In re Oliver*, 333 U.S. 257, 273, 68 S. Ct. 499, 92 L. Ed. 682 (1948)). However, given that this right is fully fleshed out by article I, section 22 of our constitution, no further discussion of a defendant's due process right to be informed of the charges against him is necessary.

Courts of this state have long made clear that CrR 2.1(d) is thus limited by our constitution. *See, e.g., State v. Lutman*, 26 Wn. App. 766, 768, 614 P.2d 224 (1980). In *Lutman*, the defendant was originally charged with hit-and-run and failure to yield. *Id.* at 767. At the conclusion of evidence, the trial court granted "a motion to amend the complaint to negligent driving." *Id.* Lutman was convicted of negligent driving and appealed. *Id.* The relevant criminal rule in effect at the time permitted an information "'to be amended at any time before judgment'" if the amendment did not prejudice the defendant. *Id.* at 768 (quoting JTR (Justice Court Traffic Rules) 3.04). Nevertheless, the Court of Appeals held that this rule "cannot bear an interpretation which would contravene [article I, section 22]" of the constitution and that "[a]n amendment during trial stating a new count charging a different crime violates this provision." *Id.* at 768, 767.

In *Carr*, this court extended the holding in *Lutman* to the *pretrial* amendment of an information, reaffirming *Olds* in the process. 97 Wn.2d at 440. In *Carr*, the defendant was originally charged with failing to register to carry goods *intrastate. Id.* at 438. Prior to trial, the prosecution discovered that the goods in question were to be transported *interstate*, to Utah, not intrastate. *Id.* Just before trial began, the prosecutor amended the information to charge the defendant under a different statute, which required that he register to carry goods interstate. *Id.* The trial court granted Carr a one-week continuance to prepare for the new charge, as well as an additional continuance at the conclusion of the State's case. *Id.* Carr was found guilty of the amended charge. *Id.* We held that despite the difference in the timing of the amendments made in *Carr* and in *Lutman*, the concerns in *Carr* were "analogous to

6

the *Lutman* case." *Id.* at 440. We noted that in *Lutman*, amending the complaint to a new charge "[a]t the conclusion of the evidence" violated Lutman's rights to be informed of the accusations against him. *Id.* There was no substantive difference in *Carr*, as we held that "amending the complaint at the start of trial violated Carr's right to be informed of the accusations against him." *Id.*

B. Pelkey *and its progeny*

Five years after we decided *Carr*, the court accepted review of *Pelkey*. 109 Wn.2d 488. The State originally charged Pelkey with one count of bribery. *Id.* at 486. However, "[a]t the conclusion of the presentation of the State's case at trial," the State amended the information to charge trading in special influence, a different crime. *Id.* We held that allowing the amendment violated Pelkey's article I, section 22 rights. *Id.* at 491.

The State argued that under CrR 2.1, the defendant bears the burden of establishing that prejudice resulted from the midtrial amendment. *Id.* at 490. We rejected this argument, repeating that CrR 2.1 operates "within the confines of article I, section 22" and that "[w]e cannot sustain an interpretation of a court rule which contravenes the state constitution." *Id.* Accordingly, we reversed Pelkey's conviction. *Id.* at 491.

In doing so, we created a rule that

> [a] criminal charge may not be amended after the State has rested its case in chief unless the amendment is to a lesser degree of the same charge or a lesser included offense. Anything else is a violation of the defendant's article 1, section 22 right to demand the nature and cause of the accusation against him or her.

*Id.* A violation of this right is per se prejudicial for the purposes of CrR 2.1.

7

The bright-line rule established in *Pelkey*, which prohibits certain midtrial amendments, is not concerned with whether the State has *formally* rested. As Justice Utter repeatedly stated in the *Pelkey* decision, a trial court cannot allow the "State to amend the information . . . *after the State completed presentation of its case in chief."* *Id.* at 487 (emphasis added); *see also id.* at 485 (other instances of this language). In *State v. Markle*, we reaffirmed this, stating that "amending a criminal charge *after the State had presented its case in chief* violate[s] the defendant's state constitutional rights under article 1, section 22 to be informed of the charges against him when the new charge is not a lesser included offense or an offense of a lesser degree." 118 Wn.2d 424, 433, 823 P.2d 1101 (1992) (emphasis added). Indeed, in *Markle* we did not even evaluate whether the State had formally rested—that the amendment was made at the end of the State's case in chief (described as a "midtrial amendment") was enough to disqualify it as "reversible error per se." *Id.* at 437.

On the other hand, we have declined to apply *Pelkey*'s bright-line rule when the State amends its case *in the midst of* its case in chief, when the defendant has an opportunity to respond meaningfully to the amendment. *Schaffer*, 120 Wn.2d at 620-21. In *Schaffer*, the trial court initially denied the State's motion to amend for lack of evidence of the charge sought. *Id.* at 618. In response, the State called an additional witness to testify. *Id.* After the witness's testimony, the State renewed its motion, and the trial court granted the amendment. *Id.* The defense then had the opportunity to cross-examine the witness (which it did), after which the State rested. *Id.* Schaffer was found guilty of the amended charge. *Id.* We upheld the amendment, noting that the rule established in *Pelkey* did not extend to this situation. *Id.* at 620-21. The court will

grant relief in these circumstances only if the defendant was prejudiced by the amendment. CrR 2.1(d). In so doing, *Schaffer* reaffirmed the *Pelkey* rule, noting that the State cannot amend its information "following the close of the State's case." *Id.* at 621.

II.   The amendment to the information violated Gehrke's constitutional rights to receive notice of the nature of the charges and an opportunity to present a defense

Here, the State moved to amend the information immediately before resting its case. The State told the court, upon moving to amend, that it "intend[ed to] rest[] [regardless] of the Court's decision [to allow the amendment." Gehrke argues that the *Pelkey* rule applies to this situation. We agree. By informing the court that it would rest its case regardless of the court's decision of the amendment, the State made clear that it had completed its case in chief. As *Pelkey* and *Markle* stated expressly, when the State has completed its case in chief, it cannot amend the information. *Pelkey*, 109 Wn.2d at 487; *Markle*, 118 Wn.2d at 433. In light of that, we agree with Gehrke. The *Pelkey* rule applies, and the amendment is barred as per se prejudicial.[4]

Situations like the one before us now are within the scope of the *Pelkey* rule because when the State explicitly states that it will rest its case after moving to amend,

---

[4] The existence of per se prejudice in this situation is no accident. In situations where, as in *Pelkey* and here, the defendant has no opportunity whatsoever to respond to the amended charges, prejudice exists inherently because the defendant has no opportunity to modify even a shred of defendant's strategy before being faced with the new charge. The defense always must build its case around the architecture provided by the State, the latter of which decides what to charge and what not to charge. (As discussed below, the mere indication provided by the State that a new charge *may* be brought is an insufficient foundation on which the defendant can properly build a case.) When the State amends the information at the end of its case, the State places the defendant not only (as is necessarily the case) in an edifice not of defendant's own making but also in one that looks entirely different from what the defendant had, up to that point, been led to expect. With half of the opportunity to respond to the new charge gone, prejudice necessarily follows.

it has *functionally rested its case in chief. Pelkey, Markle,* and *Schaffer* reiterate that the *Pelkey* rule applies when the State has completed its case in chief. If these statements are to mean something, they must mean, at least, that when the State has made it clear that it will rest its case, then it may no longer amend. We hold, therefore, that in a situation like the one before us here, where the State made it clear that it has completed its case in chief, the *Pelkey* rule applies.

The dissent argues, and the concurrence agrees, that Gehrke's case cannot be within the scope of the *Pelkey* rule because the *Pelkey* rule requires that the State formally rest its case; without such ritual formalism, the dissent indicates, the *Pelkey* rule cannot apply. Dissent at 1; concurrence at 1.

But this is wrong. *Pelkey* never required the talismanic invocation of the phrase, "the State rests." Only *once* does the *Pelkey* opinion state that its bright-line rule applies when the State "has rested its case." *Pelkey,* 109 Wn.2d at 491. In every other instance, Justice Utter makes clear that the *Pelkey* rule applies once the State has *completed its case in chief. Id.* at 485-86.[5] In the face of this, it does not matter whether the State has "formally rested" its case. Rather, *Pelkey* was, and remains, concerned with whether the State had completed its case in chief.[6] When the State *informs the*

___

[5] Specifically, Justice Utter wrote, "The State violated Const. art. 1, § 22 (amend. 10) when it amended its information to charge a separate crime after it had *already presented its case in chief," Pelkey,* 109 Wn.2d at 485 (emphasis added); "the trial court erred in permitting the State to amend the information from bribery to trading in special influence *after the State completed presentation of its case in chief, id.* at 487 (emphasis added); and "Pelkey convincingly argues the trial judge violated article 1, section 22 of the Washington State Constitution by allowing the State to amend the information against the defendant *after the State completed presentation of its case in chief." Id.* (emphasis added).

[6] Contrary to the dissent's arguments (and the concurrence's agreement with them), *Schaffer* did not disturb *Pelkey's* emphasis on whether the State had completed its case in chief, but, instead,

*trial court* that after its motion to amend, it will rest its case, then it has *completed* its case in chief. That is what the State did here. Accordingly, the *Pelkey* rule applies.

This is not to say that formalities are irrelevant. The formality of *Miranda*[7] warnings, for instance, are central to criminal procedure. But the rule advocated for by the dissent and the concurrence would make formal resting the *only* indicator of whether the *Pelkey* rule applies and would elevate formality over reality in a manner that undermines *Pelkey*. Such a formalistic rule ignores the underlying logic of that case. *Pelkey* held that article I, section 22 assures that a defendant will not be faced with a situation where the State can amend its case without affording the defendant an opportunity to adequately respond. *See Schaffer*, 120 Wn.2d at 620 (citing *Leach*, 113 Wn.2d at 695-96). Were the State allowed to amend prior to resting but when it has made clear that it has completed its case in chief (as was the case here), the *Pelkey* rule would be rendered toothless. From the defendant's perspective—the perspective the *Pelkey* rule is concerned about—there is *no difference* between allowing an amendment immediately before the State rests and immediately after, in

---

reaffirmed it. *See* dissent at 1. The dissent relies on *State v. Vangerpen*, 125 Wn.2d 782, 790, 888 P.2d 1177 (1995), to make this argument. *Vangerpen* states, in dicta and without citation, that "[w]e explained in *Schaffer* that *Pelkey only* prohibits amendments after the State has rested its case because the likelihood of prejudice is so great." *Id.* (emphasis added). *Vangerpen*'s dicta mischaracterizes *Schaffer*'s treatment of *Pelkey*. While *Schaffer* does say that *Pelkey* "addressed only the constitutionality of an amendment adopted *after* the State had rested its case," this was not a statement of law but merely a recitation of *Pelkey*'s facts—for in *Pelkey*, the State had indeed rested its case before moving to amend. *Schaffer*, 120 Wn.2d at 620-21 (some emphasis added). True, *Schaffer* also says that the *Pelkey* rule prohibits amendments made after the State has rested—but this recitation of law must be read in conjunction with another, as we went on to say that "amendments are not permitted *following the close of the State's case* because the likelihood of prejudice is too great." *Id.* at 621 (emphasis added). In other words, *Schaffer* reaffirmed what *Pelkey* itself held: the State cannot amend after it completes its case in chief, including, but not necessarily limited to, after it rests its case. Our holding in today's case is merely an application and clarification of that doctrine.

[7] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

11

a situation where, as here, the State has made clear it will rest regardless of whether the court allows the amendment. Any "unsettl[ing]" of the *Pelkey* rule is perpetrated by the dissent and the concurrence, not by our opinion. *See* dissent at 2; concurrence at 1. *Pelkey* therefore applies.

Applying *Pelkey* in the instant case creates no "unnecessary confusion" for litigants, trial judges, or appellate courts. Dissent at 2; *see also* concurrence at 1. *Pelkey*'s bright-line rule remains intact. Litigants and judges both are given a clear statement of the law: when the State has made it abundantly clear that it will rest its case after moving to amend, irrespective of the decision on that amendment, then the State has completed its case in chief and the *Pelkey* rule applies. No substantial "factual finding" is required of appellate courts to understand when this has occurred. *See* dissent at 3. Here, all that was required was to look at *what the State actually said*: that it would rest its case after moving to amend, irrespective of whether that amendment was permitted. A trial court and an appellate court need only take a prosecutor at his or her word to resolve this question.

We do not move the line of where the *Pelkey* rule applies any further into the State's case in chief than did *Pelkey* or *Schaffer*. The facts here, indeed, are very specific, concerning a likely rare situation in which the State has *said* it will rest after amending. *Schaffer*'s holding that the *Pelkey* rule does not apply in the midst of the State's case in chief thus stands. If the State had *not* completed its case in chief— and, for instance, had made clear that were the amendment denied, it would then call witnesses whose testimony would be used to support the amendment, as the State did in *Schaffer*—the outcome of this case would be different. That would *not* fall within

12

the *Pelkey* rule. But that is not what happened. The State made it clear that it had completed its case in chief. In such a situation, the *Pelkey* rule applies.

Contrary to the State's arguments, the amended charge in this case more closely resembles the amendments made in *Pelkey* and *Markle* than that made in *Schaffer*. As in *Pelkey* and *Markle*, the State here did not move to amend until it had finished presenting its entire case in chief. Gehrke was not given an opportunity during the State's case to defend against the amended charge of manslaughter, which contains an element not present in felony murder: recklessly causing the death of another. He had not been charged with manslaughter during voir dire, and he was unable to cross-examine any witnesses called by the State with the objective of raising a reasonable doubt as to recklessness in the death of Pineyro. All the concerns that this court had in *Pelkey* and reaffirmed in *Markle* exist with equal force here.

This case is unlike *Schaffer*, in which the trial court initially denied the State's motion, forcing the State to present additional testimony to support the amended charge. 120 Wn.2d at 618. In *Schaffer*, following the new witness testimony, the State renewed its motion and it was granted. *Id*. Importantly, "Schaffer had the opportunity to cross-examine the key witness . . . with full knowledge of the proposed amendment" *after* the amendment was allowed. *Id*. at 622. Here, the amendment came after the State had presented all its witnesses, and Gehrke was not able to cross-examine any witnesses regarding the new manslaughter charge.

*Schaffer* indeed demonstrates why we must answer as we do today. There, we noted that when protecting defendants' rights to fair notice of the charges and the opportunity to present a defense, "this court has avoided technical rules. Instead, we

13

have tailored our jurisprudence toward the precise evil that article I, section 22 was designed to prevent—charging documents which prejudice the defendant's ability to mount an adequate defense by failing to provide sufficient notice." *Schaffer*, 120 Wn.2d at 620 (citing *Leach*, 113 Wn.2d at 695-96).

The State also argues that the State's informing Gehrke of the *possibility* of a later amendment prior to voir dire provided adequate notice. Suppl. Br. of Resp't at 12. We disagree. Warning a defendant that the State "may" charge an additional offense after the State presents its evidence does not provide the "reasonable certainty" necessary to satisfy the defendant's constitutional right to be properly informed of the charges. *See Leach*, 113 Wn.2d at 695 ("[D]efendants have a right to be fully informed of the nature of accusations against them so that they may prepare an adequate defense. This right is satisfied when defendants are apprised with reasonable certainty of the accusations against them." (citations omitted)); *see also City of Seattle v. Proctor*, 183 Wash. 299, 304, 48 P.2d 241 (1935) ("[A defendant] is entitled to have the nature of the accusation against him sufficiently stated for the further reason that he may be enabled to prepare his defense."). Nor does a pretrial oral alert "fully inform[ ]" the defendant of the nature of the accusations such that the defendant should be expected to mount a defense against the hypothetical charge. *Leach*, 113 Wn.2d at 695. The State's implication that defendants must form a defense around the *possibility* of additional charges is entirely antithetical to our constitutional guaranties under article I, section 22.

Were it considered adequate notice to advise the defendant that another charge "may" be added, the defendant would be uniquely harmed. The defendant,

14

once told that the prosecution *might* add another charge, would have the option either to proceed as if that charge will never be brought or to alter the defense to address that possibility. This creates a dilemma. If the defendant chooses to act as if the charge will never be brought but the prosecution *does* bring the additional charge at the close of the State's case, then the defendant will have insufficiently prepared to defend against it. However, if the defendant expends time and resources defending against the charge and the prosecution *declines* to bring it, then the defendant will have wasted that time and those resources, which would otherwise have solely been utilized defending against the actual charge brought. Given that what to charge (and not to charge) rests solely in the hands of the State—and that in any criminal case the power of the State vastly outweighs that of the criminal defendant—the State cannot avoid the rules established by *Pelkey* and its progeny merely by dropping pretrial *hints* regarding possible additional or amended charges. To permit the State to wait until resting its case to amend the information would allow fundamental unfairness to creep into the trial, and "our system of the administration of justice suffers when any accused is treated unfairly." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The State must put all of its cards on the table at the outset; the State may not bluff.

Not only is a verbal hint insufficient to notify a defendant of the charges but, here, the prosecutor did not even give Gehrke an *accurate* warning against which he could have mounted a defense. In telling Gehrke that the State "may" add a charge, the prosecutor also mistakenly indicated that first degree manslaughter was a lesser offense to felony murder. If manslaughter were a lesser included offense, it would by

15

its nature require no additional notice and no changes to the defense at trial, as a lesser included offense necessarily contains only elements present in the charged offense. *State v. Berlin*, 133 Wn.2d 541, 545, 947 P.2d 700 (1997). However, the prosecutor's warning to Gehrke was misleading: first degree manslaughter is *not* a lesser included offense to Gehrke's original felony murder charge. *State v. Gamble*, 154 Wn.2d 457, 469, 114 P.3d 646 (2005) ("We hold that first degree manslaughter is not a lesser included offense of second degree felony murder where second degree assault . . . is the predicate felony."). Second degree felony murder based on second degree assault requires the State to prove that the defendant "acted intentionally and 'disregard[ed] a substantial risk that [substantial bodily harm] may occur,'" while first degree manslaughter requires the State to prove that the defendant "'[knew] of and disregard[ed] a substantial risk that a [homicide] may occur.'" *Id.* at 467-68 (alterations in original) (emphasis omitted) (quoting RCW 9A.08.010(1)(c)). Further, "[b]ecause manslaughter requires the proof of a mens rea element [recklessness] vis-à-vis the resulting death, while felony murder as charged here [predicated on second degree assault] does not, it cannot be a lesser included offense to the State's felony murder charge." *Id.* at 469. Therefore, the prosecutor's warning did not alert Gehrke to such additional elements or the crucial differences between the two crimes. Thus the State cannot convincingly argue that the erroneous "warning" provided Gehrke with constitutionally sufficient notice to mount a defense against the then hypothetical charge.

The State also argues that Gehrke's failure to request a continuance is evidence that the amendment should be upheld. This, too, is inapposite. Failure to

seek a continuance indicates a lack of surprise and prejudice only when the amendment is made at the *beginning* of trial. *See State v. Brown*, 74 Wn.2d 799, 801, 447 P.2d 82 (1968) (holding that failure to request a continuance after an information is amended *at the start of trial* is "persuasive of a lack of surprise and prejudice"). When the State amends the charges *after* it has presented its entire case in chief, as it did here, a continuance is of little value: a jury has been picked, opening arguments have been made, and the defense has already cross-examined the State's witnesses—all based on the offense as charged. *See Pelkey*, 109 Wn.2d at 490 ("All of the pretrial motions, voir dire of the jury, opening argument, questioning and cross examination of witnesses are based on the precise nature of the charge alleged in the information."). Furthermore, Gehrke's attorney indicated that he *would* have sought a continuance had the information been amended prior to the commencement of trial.

Finally, the State's amendment also does not fit into either of the two exceptions to the rule against midtrial amendments. These exceptions apply when the amendment either is to a lesser degree of the original charge or is a lesser included offense of the original charge. *Pelkey*, 109 Wn.2d at 491. Here, the State initially charged Gehrke with second degree felony murder predicated on second degree assault and then moved to amend to first degree manslaughter. As we held in *Gamble*, "first degree manslaughter is not a lesser included offense of second degree felony murder where second degree assault . . . is the predicate felony." 154 Wn.2d at 469; *see also Berlin*, 133 Wn.2d at 550. Thus, the first degree manslaughter charge could not have been a lesser included offense. *See id*. First degree manslaughter is also

17

not a lesser degree felony murder. Therefore, neither of the exceptions to the rule applies.[8]

In light of this, we hold that by allowing this amendment to the information, the trial court abused its discretion as it acted on an erroneous view of the law set down in *Pelkey. State v. Quismundo*, 164 Wn.2d 499, 504, 192 P.3d 342 (2008) ("a court 'would necessarily abuse its discretion if it based its ruling on an erroneous view of the law'" (quoting *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993))).

III.    We remand to the trial court for vacation of Gehrke's conviction and dismissal of the first degree manslaughter charge with prejudice

Gehrke has asked us to order that his manslaughter conviction be dismissed with prejudice pursuant to the mandatory joinder rule. The mandatory joinder rule provides that related charges against a defendant shall be consolidated for trial. CrR 4.3.1(a). Charges are related within the meaning of this rule if "they are within the jurisdiction and venue of the same court and are based on the same conduct." CrR 4.3.1(b)(1). In the case of an untimely amendment to the information, the mandatory

---

[8] We have decided this case under the per se rule crafted by *Pelkey*. However, were it otherwise—that is, were this case outside the boundaries of the per se rule—we would still reverse, as Gehrke was clearly prejudiced by the trial court's allowing the amendment to the information. The concurrence is correct to so conclude. Prejudice in this context involves surprise or inability to prepare a defense. *See State v. James*, 108 Wn.2d 483, 489, 739 P.2d 699 (1987) (citing *State v. Purdom*, 106 Wn.2d 745, 725 P.2d 622 (1986); *State v. Jones*, 26 Wn. App. 1, 6, 612 P.2d 404 (1980)). Prejudice is also more likely when the amended information alleges additional counts rather than merely specifying "'a different manner of committing the crime originally charged or charg[ing] a lower degree of the original crime charged.'" *Schaffer*, 120 Wn.2d at 621 (citation omitted) (quoting *Pelkey*, 109 Wn.2d at 490-91). Here, because the State's amendment occurred after the jury had heard the State's entire case and the amendment alleged an additional charge, Gehrke would have been prejudiced. The State's warning that an additional charge might be brought does no more to cure the prejudice than it does to insulate the State against the per se rule.

joinder rule requires dismissal with prejudice of the charge in the late-filed amendment (unless the ends of justice exception applies). *See State v. Dallas*, 126 Wn.2d 324, 327-28, 892 P.2d 1082 (1995) (citing *Pelkey*, 109 Wn.2d at 491).

In light of this clear precedent, we agree with Gehrke. We remand to the trial court for vacation of his conviction and dismissal of the first degree manslaughter charge with prejudice.[9]

## CONCLUSION

For the foregoing reasons, we reverse the Court of Appeals and remand to the trial court for vacation of Gehrke's conviction and dismissal of the first degree manslaughter charge with prejudice, and for further proceedings consistent with this opinion.

---

[9] As the concurrence correctly points out, the result would be the same were we to hold that CrR 2.1(d) prejudice, not the *Pelkey* rule, disposes of this case. Concurrence at 2.

19

_Wiggins, J._

WE CONCUR.

_Stephens, J._

_Madsen, J._

_Gordon McCloud, J._

No. 95635-9

FAIRHURST, C.J. (concurring)—CrR 2.1(d) permits amendments to criminal charges "at any time before verdict or finding if substantial rights of the defendant are not prejudiced." We have established a bright line rule that "[a] criminal charge may not be amended *after the State has rested its case in chief* unless the amendment is to a lesser degree of the same charge or a lesser included offense" because such an amendment creates prejudice per se. *State v. Pelkey*, 109 Wn.2d 484, 491, 745 P.2d 854 (1987) (emphasis added). I agree with the dissent that maintaining this bright line rule is important in order to give clarity to both judges and litigants. *See* dissent at 3-4. I also agree that because, in this case, the State moved to amend *before* resting its case in chief, this rule does not apply.

However, I write separately because I believe that Michael L. Gehrke demonstrated actual prejudice in this case. *See* lead opinion at 18 n.7. Prejudice under CrR 2.1(d) involves surprise or inability to prepare a defense. *See State v. James*, 108 Wn.2d 483, 489, 739 P.2d 699 (1987). Prejudice is more likely "when a jury is involved and the amendment occurs late in the State's case." *State v. Schaffer*,

1

120 Wn.2d 616, 621, 845 P.2d 281 (1993). In this jury trial, the State added a new charge directly before resting. This charge included a new element—recklessness. Gehrke could not address this element in his voir dire, opening statement, or cross-examination of any of the State's witnesses. *See Pelkey*, 109 Wn.2d at 490 (explaining that where all of this has already occurred, "the defendant is highly vulnerable to the possibility that jurors will be confused or prejudiced by a variance from the original information"). A continuance would not have allowed Gehkre to retroactively change his trial strategy in these crucial stages. *See* lead opinion at 17. The lead opinion convincingly explains why the State's warning at the beginning of trial that it *may* move to amend at some point was insufficient to cure this prejudice. *See id.* at 14-17. In this case, the trial court also conceded that a defense to manslaughter may involve "somewhat of a differen[t] strategy" than a defense to second degree felony murder but allowed the amendment because it felt that the defenses were similar enough. I believe this was an abuse of discretion. 3 Verbatim Report of Proceedings at 550. Because Gehrke was unable to effectively prepare a defense to the recklessness element of first degree manslaughter, I would hold that the trial court improperly allowed the State to amend the charges and would dismiss the manslaughter charge with prejudice.

Fairhurst, C.J.

3

No. 95635-9

GONZÁLEZ, J. (dissenting)—Resting a case means something. After the State formally rests in a criminal case, it may not offer any more evidence, call any more witnesses, or amend the information without reopening the case with permission of the court for good cause shown. This is a bright line rule. *See State v. Schaffer*, 120 Wn.2d 616, 621, 845 P.2d 281 (1993) (citing *State v. Pelkey*, 109 Wn.2d 488, 490-91, 745 P.2d 854 (1987)). The lead opinion proposes the per se rule of *Pelkey* applies *before* the State has rested its case in chief. I respectfully dissent.

We have previously declined to extend the per se rule "to a point earlier in the [trial,]" and we should decline to do so again. *See id.* at 622; *accord State v. Vangerpen*, 125 Wn.2d 782, 790, 888 P.2d 1177 (1995); *see also State v. Hockaday*, 144 Wn. App. 918, 926, 184 P.3d 1273 (2008) ("In *Schaffer*, our Supreme Court strictly limited *Pelkey* to situations where the State brings the motion to amend the information *after* resting its case, emphasizing the risk of prejudice").

The State can amend the charges midtrial, but that power is properly limited by constitutional concerns. *See* CONST. art. I, § 22; *Pelkey*, 109 Wn.2d at 490 (CrR 2.1(d) "operates within the confines of article 1, section 22."). As a practical matter, the further into the trial, the harder it is to amend the charges because of the increasing likelihood of prejudice. CrR 2.1(d). Further, "[a] criminal charge may not be amended after the State has rested its case in chief." *Pelkey*, 109 Wn.2d at 491. Once the State rests, prejudice is presumed, except in well-established situations. *See, e.g., State v. Peterson*, 133 Wn.2d 885, 889-90, 948 P.2d 381 (1997) (quoting *State v. Ackles*, 8 Wash. 462, 464-65, 36 P. 597 (1894)). All of this is settled law.

The lead opinion attempts to unsettle this law because it believes allowing the State to amend the information after it has called its last witness but before it has rested would be unfair to Michael Gehrke. *See* lead opinion at 9. But the current rule already protects against unfairness. The lead opinion need only apply CrR 2.1(d) to the facts of the case to determine whether it is unfair to the defendant to allow amendment. *See Hockaday*, 144 Wn. App. at 927 ("Where, as here, the *Pelkey* rule does not apply, the defendant has the burden of demonstrating prejudice under CrR 2.1(d)."). If the amendment is unfair—if it prejudices the defendant—it is not allowed. Instead of hewing to this simple approach, the lead opinion attempts to change the rule itself, creating unnecessary confusion.

2

Some formalities are meaningful, including when the State formally rests in a criminal case. *See, e.g., Pelkey*, 109 Wn.2d at 491. When the State has no more witnesses to call, no more evidence to offer, and is, for all purposes, done presenting its case in chief, *then the State will rest its case.* Then *Pelkey* applies because "[a] criminal charge may not be amended after the State has rested its case in chief," except under highly limited circumstances. *Id.* Now, the lead opinion proposes a rule that calls on appellate courts to make a factual finding that the State has "functionally rested its case in chief" in order to apply *Pelkey. See* lead opinion at 10 (emphasis omitted). The lead opinion states that its proposed rule does not disturb the bright line rule or move it to a point earlier in the trial. *See id.* at 12-13. This is simply false.

The lead opinion argues that if the State were "allowed to amend prior to resting but when it has made clear that it has completed its case in chief (as was the case here), the *Pelkey* rule would be rendered toothless." Lead opinion at 11. Presumably, what it means is that *Pelkey* would not protect against prejudice. But *Pelkey* is only a piece of the whole; the constitutional protection against prejudicial amendments and the right to know charges brought against you would remain. *See* CONST. art. I, § 22; CrR 2.1(d). At this point, because the State had not rested, the CrR 2.1(d) standard would apply, and the trial court could still find prejudice

3

against the defendant and deny the amendment. *Pelkey* would not be rendered toothless, it is simply not yet invoked.

It appears that the lead opinion's confusion grows largely from the fact that cases have characterized the *Pelkey* application point as the point when the State "rested its case" but also when the State "completed its case in chief." Under my reading of the cases, it is clear that the State's actual resting point is the desired *Pelkey* application mark. This is why it is a "bright line" rule. *Vangerpen*, 125 Wn.2d at 790. But as the lead opinion correctly states, Justice Utter stated the holding of *Pelkey* as "after the State has rested its case in chief" and in other parts of the opinion characterized the same point as "after the State completed presentation of its case in chief." *Pelkey*, 109 Wn.2d at 491, 487. This may be because no verbatim report of proceedings was presented to the *Pelkey* court and it had to make reasonable inferences from the narrative report before it. *Id*. at 485 n.1. Justice Utter simply equated "after the State has rested its case in chief" with "after the State completed presentation of its case in chief." In other words, "completion of the State's case in chief" means it has rested. Through semantic gymnastics, the lead opinion splits the two and attempts to move the application point to a point earlier in the trial. We should not, and since a majority in this case would not, we do not.

Extending the per se rule interferes with a trial judge's courtroom management. Trial courts can no longer rule on the State's amendment when the court entertains "halftime" motions "[f]ollowing the State's final witness but before the State rests." *See, e.g., State v. Holtz*, No. 43995-6-II (Wash. Ct. App. Aug. 19, 2014) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2043995-6-II%20%20Unpublished% 20Opinion.pdf; *see also State v. Phillips*, 98 Wn. App. 936, 940, 991 P.2d 1195 (2000) (quoting *State v. Kjorsvik*, 117 Wn.2d 93, 103, 812 P.2d 86 (1991)). Instead, the court will need to entertain the State's motion before the indeterminate moment when the State has "functionally rested its case in chief." Lead opinion at 10 (emphasis omitted).

This court should apply our existing CrR 2.1(d) standard. Under that standard, Gerhke cannot show that he suffered any actual prejudice from the amendment. In other words, it was not an abuse of discretion for the trial judge to allow that amendment. Under the lead opinion's proposed rule, there would be per se prejudice. I disagree. Under the lead opinion's approach, the mandatory joinder rule would attach and it would necessarily follow that the manslaughter charge must be dismissed with prejudice. *State v. Dallas*, 126 Wn.2d 324, 327-28, 892 P.2d 1082 (1995). This shows the arbitrary and unfortunate consequences of extending the per se rule to an indeterminate point earlier in the trial. The lead

opinion can reach the same result if it believes there was prejudice to Gehrke without changing the rule. I respectfully dissent.